**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**RANDY LEE RICHARDS,**

                Plaintiff,

**v.**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

                Defendant.

**CIVIL ACTION NO.: 5:16-CV-21**
**(STAMP)**

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On February 24, 2016, Plaintiff Randy Lee Richards ("Plaintiff"), through counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On May 3, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On June 1, 2016, and July 20, 2016,[1] Plaintiff and the Commissioner filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J.

---

[1] On June 30, 2016, the Commissioner filed a Motion [ECF No. 12] for an extension of time in which to file her motion for summary judgment. On July 1, 2016, the Court entered an Order [ECF No. 13] granting the Motion and extending the Commissioner's deadline to August 1, 2016. Because the Commissioner filed before this date, her Motion for Summary Judgment and supporting brief are deemed timely filed.

("Def.'s Mot."), ECF No. 14). The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. <u>PROCEDURAL HISTORY</u>

On February 25, 2013, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on November 21, 2008. (R. 28, 175). Plaintiff's claim was initially denied on May 24, 2013, and denied again upon reconsideration on July 2, 2013. (R. 100, 112). After these denials, Plaintiff filed a written request for a hearing. (R. 115).[2] Subsequently, on June 25, 2014, Plaintiff filed a Title XVI claim for supplemental security income ("SSI") benefits, "which was escalated to the hearing level." (R. 28, 191).

On July 18, 2014, a video hearing was held before United States Administrative Law Judge ("ALJ") Harry C. Taylor, II, in Charleston, West Virginia. (R. 28, 46, 133). Plaintiff, represented by counsel Harold Carpenter, Esq., of Jan Dils Attorneys at Law, L.C., appeared and testified in Parkersburg, West Virginia. (R. 28, 48). Judith Brendemuehl, M.D., and George S. Bell, M.D., two impartial medical experts, also testified at the hearing, as well as Casey B. Vass, an impartial vocational expert. (R. 28, 47). On September 9, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding

---

[2] Plaintiff previously filed a Title II claim for DIB and a Title XVI claim for SSI benefits on April 27, 2007. (R. 28). These claims were initially denied and denied again upon reconsideration. (<u>Id.</u>). Although Plaintiff filed a written request for a hearing, he failed to appear for the hearing and did not respond to a Notice to Show Cause for Failure to Appear that was sent to him after the hearing date. (<u>Id.</u>). Therefore, on January 26, 2009, an abandonment dismissal was issued for both claims. (R. 28, 69-72).

that he was not disabled within the meaning of the Social Security Act. (R. 25). On March 10, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

### III. BACKGROUND

#### A. Personal History

Plaintiff was born on February 10, 1962, and was fifty-one years old at the time he filed his claim for DIB. (See R. 73). He is 5'10" tall and weighs approximately 250 pounds. (R. 201). He is divorced[3] and lives in a house with his ninety-five-year-old mother. (R. 58, 212-13). He has completed high school but has never participated in any specialized, trade or vocational training. (R. 202). His prior work experience includes working as a laborer in a window factory and as a truck driver. (R. 65). He alleges that he is unable to work due to the follow ailments: (1) depression; (2) high blood pressure; (3) arthritis; (4) left ankle impairments; (5) high cholesterol; (6) acid reflux and (7) a thyroid impairment. (R. 201).

#### B. Medical History

##### 1. Medical History Pre-Dating Alleged Onset Date of November 21, 2008

On May 9, 2002, Plaintiff presented to the emergency room at Camden-Clark Memorial Hospital, complaining of bilateral ankle pain. (R. 248-50). X-rays of Plaintiff's ankles were ordered, which revealed no abnormalities. (R. 250). After an examination, Plaintiff was diagnosed with a "[left] ankle sprain [with] chronic pain." (R. 248). Plaintiff was prescribed "Lortab/Motrin" for his pain. (Id.).

---

[3] Plaintiff "was married for eleven years and then he and his former wife divorced in 1995." (R. 326). He has two daughters, ages twenty-two and twenty-eight years. (Id.).

On May 17, 2002, Plaintiff presented to Dauphin Orthopedics, complaining that his left ankle was swollen. (R. 261). James M. Dauphin, M.D., evaluated Plaintiff, noting that Plaintiff had suffered a left ankle sprain in 2001 and had experienced chronic pain in his left ankle since that time. (Id.). After the evaluation, Dr. Dauphin ordered an MRI of Plaintiff's left ankle. (Id.). The results of the MRI are as follows:

1. There [was] a moderate sized ankle joint effusion.
2. Incidental note [was] made of an os trigonum.
3. There [was] some very faint marrow edema in the talus and the calcaneus but no discrete lesion or other abnormality [was] seen.
4. A small amount of fluid along the flexor hallucis longus tendon but may be physiologic.

(R. 264). Subsequently, Dr. Dauphin diagnosed Plaintiff with left ankle osteoarthritis and a "probable osteochondral lesion too small to see on MRI." (R. 260). Dr. Dauphin administered a steroid injection in Plaintiff's left ankle to treat Plaintiff's pain but after that "did not help," Dr. Dauphin instructed Plaintiff that surgery was necessary. (R. 259-60).

On June 13, 2002, Plaintiff presented to Camden-Clark Memorial Hospital for an arthroscopic laser debridement of his left ankle. (R. 251). During the surgery, a sample of the debrided tissue was collected for analysis, which revealed "fragments of synovial tissue with mild chronic inflammation." (R. 253). Plaintiff tolerated the surgery well. (R. 251).

After his surgery, Plaintiff presented to Dauphin Orthopedics approximately once a month for post-surgical treatment of his ankle. (R. 255-58, 265). On June 26, 2002, Dr. Dauphin reported that Plaintiff had been "doing well" since his surgery. (R. 258). Dr. Dauphin further reported that Plaintiff was prescribed Celebrex and Darvocet for his left ankle pain. (Id.). On July 19, 2002, Angela D. Miller, R.N., reported that Plaintiff's pain

medications had changed to Vicodin and Motrin and that Plaintiff was feeling "better." (R. 256). On August 2, 2002, Ms. Miller documented that Plaintiff was complaining of ankle pain and swelling after standing for any extended period of time. (R. 255). Subsequently, Dr. Dauphin ordered an MRI of Plaintiff's left ankle, which revealed "[n]o significant changes from [the] previous MRI." (R. 263). On September 4, 2002, Dr. Dauphin reported that Plaintiff was drinking six alcoholic drinks a day, after which he instructed Plaintiff to "cut down on beer." (R. 265). On November 27, 2002, Dr. Dauphin documented that Plaintiff "probabl[y] has avascular necrosis from alcohol, [although] it does not show on [the] MRI." (R. 268). Dr. Dauphin further documented that Plaintiff had "quit drinking completely" after his last visit. (Id.).

On March 12, 2003, Plaintiff presented to Nick Zervos, M.D., of Mountain State Orthopedic Associates, Inc., after being referred by Dr. Dauphin. (R. 41-42). Plaintiff informed Dr. Zervos that "he . . . [had been] riding 60 miles per hour . . . on an ATV back in the summer of 2001 and [had] jammed his left ankle as his ATV started to fall over." (R. 41). After an examination, Dr. Zervos noted that Plaintiff "seems to have a locked up subtalar joint," due to posterior subtalar impingement and inflammation, that "does not move at all." (Id.). Dr. Zervos recommended "a differential injection of Marcaine and Depo-Medrol" into Plaintiff's left ankle, to which Plaintiff agreed. (Id.). Dr. Zervos performed the procedure that day, which Plaintiff tolerated well. (See id.). Dr. Zervos instructed Plaintiff that, if the procedure did not work, "then he might benefit from an os trigonum excision." (R. 41-42).

After Plaintiff's appointment at Mountain State Orthopedic Associates, Plaintiff continued to present to Dauphin Orthopedics for left ankle treatment. On September 16,

2003, Dr. Dauphin reported that, while Plaintiff had been doing well, he was again experiencing left ankle pain and swelling. (R. 266). On December 24, 2003, Dr. Dauphin documented that Plaintiff was "having a difficult time at work" due to his ankle symptoms. (R. 267). Therefore, Dr. Dauphin instructed Plaintiff to take a break "after [standing] or sitting for over 4 [hours] at a time," to avoid twisting his ankle and to limit himself to lifting, pushing and pulling no more than fifteen pounds. (Id.). On January 20, 2004, Dr. Dauphin ordered X-rays of Plaintiff's left ankle due to "[p]ain following [an] injection." (R. 43). However, the X-rays revealed no abnormalities. (Id.).

### 2. Medical History Post-Dating Alleged Onset Date of November 21, 2008

On January 5, 2010, Plaintiff presented to the Minnie Hamilton Health Care Center, complaining of "[hypertension] problems." (R. 272). Plaintiff stated that he had been out of his prescribed medications for two months and needed refills. (Id.). Plaintiff's chart indicated that Plaintiff was receiving the following treatment from the Health Care Center: (1) Lexapro for depression with anxiety; (2) Benicar for hypertension; (3) Crestor for hyperlipidemia; (4) Synthroid for hypothyroidism and (5) Nexium for acid reflux. (R. 272-74). After an examination, Plaintiff's blood pressure was noted to be 144/90. (R. 272). Plaintiff was given refills of his medications and instructed to return to the Health Care Center in two weeks for a blood pressure check. (R. 274). When Plaintiff returned, it was documented that his blood pressure was "well controlled." (R. 269).

On October 29, 2011, Plaintiff returned to the Minnie Hamilton Health Care Center, complaining of anxiety. (R. 316). Plaintiff stated that he had been "out of Lexapro for 8 days" and that he was "now jittery." (Id.). Plaintiff was given a refill for one

week and instructed to return before then for a re-evaluation of his medication needs. (R. 317). When Plaintiff returned for his medication re-evaluation, it was noted that Plaintiff's hypertension was "currently stable" and that his acid reflux symptoms were improving. (R. 312). However, it was further noted that Plaintiff had not taken his Synthroid prescription in "over a month" and that his compliance with medication, diet and exercise was poor. (Id.). As a result, Plaintiff was instructed to monitor his diet and initiate an exercise program. (R. 314). Plaintiff was also instructed to increase his Benicar dose and resume his other medications, although his prescription of Lexapro was changed to Celexa due to financial reasons. (Id.).

On February 5, 2013,[4] Plaintiff presented to the Minnie Hamilton Health Care Center, complaining of ankle pain and depression. (R. 305). It was noted that Plaintiff's blood pressure was "elevated . . . but [that he] may not have taken [his Benicar] pill," although Plaintiff's blood pressure remained under his "[g]oal [of] 140/90." (R. 305-07). It was further noted that Plaintiff's depression was "better" on Celexa and that Plaintiff was "looking forward to warmer weather when he can do outdoor activities again." (R. 305). After an examination, Plaintiff, despite requesting Vicodin,[5] was instructed to take Mobic for his ankle pain and encouraged to lose weight, exercise and monitor his diet. (R. 305, 307). An X-ray of his left ankle was also recommended, although Plaintiff refused it due to the cost, explaining that he does not have health insurance. (R. 307).

On February 25, 2013, Plaintiff returned to the Minnie Hamilton Health Care Center. (R. 301). Plaintiff stated that, while his moods were better, he would become

---

[4] Plaintiff only submitted one treatment record, from the Minnie Hamilton Health Care Center, for the year of 2012. (See R. 309). However, Plaintiff "left before being seen by [the] provider" during that visit. (Id.).
[5] Plaintiff stated that he had "taken a family member['s] pain medication with improvement." (R. 305).

agitated easily and that he wanted his Celexa dosage increased. (Id.). Plaintiff further stated that he continued to experience left ankle pain. (Id.). After an examination, it was noted that Plaintiff's depression screening was negative. (R. 303). Nevertheless, Plaintiff's prescription of Celexa was increased. (Id.). Plaintiff was also instructed to stay on a low sodium diet for his hypertension and to continue his exercise program. (Id.).

On April 17, 2013, Plaintiff presented to Braxton County Memorial Hospital for X-rays of his left ankle due to his pain. (R. 318). However, the X-rays revealed no abnormalities. (Id.).

On March 6, 2014, Plaintiff presented to the Minnie Hamilton Health Care Center, complaining of hand swelling and stiffness "on almost a daily basis," possible sarcoidosis symptoms. (R. 338). Plaintiff also complained of insomnia but stated that he "[did] not relate this to his depression." (Id.). After an examination, Plaintiff was prescribed trazodone for his insomnia and referred to an ophthalmologist due to his history of sarcoidosis. (R. 340). A chest X-ray was also ordered due to his history of sarcoidosis, although the results of the X-ray were normal. (R. 347). As for Plaintiff's hypertension, it was documented to be "currently stable." (R. 338). It was further documented that Plaintiff "ha[d] not done well" restricting sodium from his diet but that he would "continue with additional effort." (R. 340).

On April 4, 2014, Plaintiff presented to Mark J. Cinalli, OD, FAAO, an ophthalmologist, of the Gilmer County Eye Clinic. (R. 348). During this visit, Dr. Cinalli performed an eye examination of both of Plaintiff's eyes and reported largely normal findings. (Id.). Therefore, Plaintiff was educated on the signs and symptoms of sarcoidosis. (Id.).

On April 6, 2014, Plaintiff presented to the Minnie Hamilton Health Care Center, complaining of, *inter alia*, hypertension symptoms. (R. 330). It was documented that Plaintiff's hand swelling was related to his hypothyroidism and that the swelling was "improving." (Id.). Nevertheless, Plaintiff's Synthroid dosage was increased. (R. 331). It was also noted that Plaintiff's blood pressure, which was 128/87, was "controlled." (R. 330-31).

On June 20, 2014, Plaintiff returned to the Minnie Hamilton Health Care Center, requesting that his Celexa prescription be changed backed to Lexapro and complaining of, *inter alia*, right hip and left ankle pain. (R. 350). After an examination, X-rays of Plaintiff's right hip were ordered, the results of which were normal. (R. 353). Therefore, Plaintiff was instructed to "continue chronic therapy as he is doing well and is stable with his pain." (R. 352). Plaintiff's prescription of Celexa was also changed back to Lexapro. (Id.).

On July 2, 2014, Plaintiff again returned to the Minnie Hamilton Health Care Center, complaining of continuing right hip and left foot pain. (R. 354). During this visit, it was noted that Plaintiff's pain medications consisted of non-steroidal anti-inflammatory drugs ("NSAIDs") and Norco and that Plaintiff "has [had] some improvement" on these medications. (Id.). Therefore, Plaintiff was instructed to continue with the same pain medication regimen. (R. 355).

### 3. Medical Reports/Opinions

#### a. Treating Source Statement by James M. Dauphin, M.D., May 10, 2006

On May 10, 2006, Dr. Dauphin submitted a Treating Source Statement regarding Plaintiff's first claim for DIB and SSI benefits. (R. 254). In this letter, Dr. Dauphin

reported that he had treated Plaintiff for severe left ankle arthritis from 2002 to 2004. (Id.). Dr. Dauphin further reported that Plaintiff's "medical condition prevents him from doing standing work." (Id.). Therefore, Dr. Dauphin recommended that Plaintiff "obtain a sitting job."[6] (Id.).

### b. Mental Status Examination by Cynthia Spaulding, M.A., May 18, 2013

On May 18, 2013, Cynthia Spaulding, M.A., performed a Mental Status Examination of Plaintiff. (R. 325-28). Prior to this examination, Ms. Spaulding noted that Plaintiff's chief complaints consist of multiple physical ailments, including arthritis, hypertension, left ankle impairments, high cholesterol, acid reflux and a thyroid impairment. (R. 325). Ms. Spaulding further noted that Plaintiff complains of depression. (Id.).

The Mental Status Examination consisted of a clinical interview and a mental assessment of Plaintiff. (Id.). During the clinical interview, Plaintiff informed Ms. Spaulding that he feels sad or irritable "more days than not." (Id.). Plaintiff also informed Ms. Spaulding that he is unable "to enjoy previously enjoyed activities" and that he lacks motivation "to attend to daily activities." (Id.). Finally, Plaintiff informed Ms. Spaulding that spends his time "in [his] house with the windows closed up." (Id.).

After interviewing Plaintiff, Ms. Spaulding performed a thorough mental assessment of Plaintiff. (See R. 327-28). While this assessment revealed mostly normal findings, Ms. Spaulding documented several abnormal findings. (See id.). For example, Ms. Spaulding documented that Plaintiff's mood was depressed and affect was restricted. (R. 327). She further documented that Plaintiff's attention span was mildly

---

[6] Dr. Dauphin noted that, due to his recommendation, Plaintiff had quit his job at Simonton Windows. (R. 254).

impaired and that his judgment was moderately impaired. (R. 328). After completing the

Mental Status Examination, Ms. Spaulding concluded that Plaintiff suffers from recurrent

moderate major depressive disorder and a personality disorder. (Id.). Additionally, Ms.

Spaulding concluded that Plaintiff's prognosis is fair. (Id.).

### c. Disability Determination Examination by Arturo Sabio, M.D., April 27, 2013

On April 27, 2013, Arturo Sabio, M.D., performed a Disability Determination

Examination ("DDE") of Plaintiff. (R. 319-24). The DDE consisted of a clinical interview

and of a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff

informed Dr. Sabio that his medical history includes diagnoses of hypertension and

GERD. (R. 319). He further informed Dr. Sabio that he has been diagnosed with

hypothyroidism and, despite being on medication for "about 7 years now," still

experiences "extreme sensitivity to cold weather." (Id.). Finally, Plaintiff informed Dr.

Sabio that he has been diagnosed with arthritis pains in his hands, right hip and left

ankle and that "[h]e was injured about 15 years ago in an ATV accident," which "messed

up" his left ankle. (R. 319-20).

After the clinical interview, Dr. Sabio performed a physical examination of

Plaintiff. (R. 320-22). While this examination revealed mostly normal findings, Dr. Sabio

documented several abnormal findings. (See id.). For example, Dr. Sabio noted:

There is tenderness in the right hip. . . .

[Plaintiff] is not able to walk on the toes because of pain in the left ankle. .
. .

There is slight swelling and there is tenderness on the medial aspect of
the left ankle. He complains mostly of pain when he is walking downhill. . .
. [He] had a stiffness in the left ankle with dorsiflexion limited to 10

degrees, plantar extension 40 degrees, the restriction is due to pain at the Achilles tendon extension and in the medial aspect of the ankle. . . .

(R. 321-23). After completing the DDE, Dr. Sabio concluded that Plaintiff suffers from: (1) hypertension; (2) GERD; (3) hypothyroidism and (4) posttraumatic degenerative arthritis in the left ankle. (R. 322).

### d.  Disability Determination Explanation by Joyce Goldsmith, M.D., May 19, 2013

On May 19, 2013, Joyce Goldsmith, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 73-84). Prior to drafting the Initial Explanation, Dr. Goldsmith reviewed, *inter alia*, Plaintiff's medical records, treatment notes, Personal Pain Questionnaire and Adult Function Report. (R. 74-75). After reviewing these documents, Dr. Goldsmith concluded that Plaintiff suffers from the following severe impairments: (1) osteoarthritis and allied disorders; (2) essential hypertension; (3) thyroid gland disorders, all disorders except malignant neoplasm; (4) diseases of the esophagus and (5) affective disorders. (R. 78).

In the Initial Explanation, Dr. Goldsmith completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 80-82). During this assessment, Dr. Goldsmith found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Goldsmith found that Plaintiff is able to: occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for approximately six hours in an eight-hour workday or sit for approximately six hours in an eight-hour workday. (R. 80). Dr.

Goldsmith further found that Plaintiff is limited in his ability to push with his left lower extremity. (Id.). Regarding Plaintiff's postural limitations, Dr. Goldsmith found that Plaintiff is able to balance, stoop and kneel without limitation but is only able to occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, crouch and crawl. (R. 80-81).

Regarding Plaintiff's environmental limitations, Dr. Goldsmith found that Plaintiff need not avoid extreme heat, humidity, noise, vibration, hazards or "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 81). However, Dr. Goldsmith further found that Plaintiff must avoid concentrated exposure to extreme cold and wetness. (Id.). After completing the RFC assessment, Dr. Goldsmith determined that Plaintiff is able to perform light-exertional work. (R. 83).

Also in the Initial Explanation, Karl G. Hursey, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. (R. 78). On this form, Dr. Hursey initially noted that Plaintiff has been diagnosed with affective disorders and personality disorders. (Id.). Dr. Hursey then analyzed the degree of Plaintiff's functional limitations. (Id.). Specifically, Dr. Hursey rated Plaintiff's restriction in his activities of daily living as "mild." (Id.). Dr. Hursey additionally rated Plaintiff's limitations in maintaining social functioning and difficulties in maintaining concentration, persistence or pace as "mild." (Id.). Finally, Dr. Hursey rated Plaintiff's episodes of decompensation as "none." (Id.).

### e. Disability Determination Explanation by Fulvio Franyutti, M.D., July 1, 2013

On July 1, 2013, Fulvio Franyutti, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the

"Reconsideration Explanation"). (R. 86-96). Prior to drafting the Reconsideration Explanation, Dr. Franyutti reviewed the same documents that Dr. Goldsmith had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records and treatment notes. (R. 87-89). After reviewing these documents, Dr. Franyutti agreed with all of Dr. Goldsmith's conclusions contained in the Initial Explanation. (See R. 90, 92-96).

Also in the Reconsideration Explanation, G. David Allen, Ph.D., a state agency psychologist, reviewed Dr. Hursey's Psychiatric Review Technique form from the Initial Explanation. (R. 90-91). After reviewing the form, Dr. Allen agreed with all of Dr. Hursey's conclusions contained within it. (Id.).

**C.    Testimonial Evidence**

**1.  Medical Expert Testimony**

During the administrative hearing on July 18, 2014, both Judith Brendemuehl, M.D., and George S. Bell, M.D., two impartial medical experts, presented testimony. Dr. Brendemuehl testified regarding Plaintiff's physical impairments. Specifically, Dr. Brendemuehl testified that Plaintiff suffers from the following significant physical conditions: (1) ankle impairments; (2) hypothyroidism and (3) sarcoidosis. (R. 51-53). Dr. Brendemuehl also testified that Plaintiff is obese. (R. 53). Due to these conditions, Dr. Brendemuehl opined that Plaintiff should be limited to light exertional work and should never climb ladders/ropes/scaffolds, climb ramps/stairs, kneel, crawl or encounter heights or hazardous machinery. (R. 53-54). Dr. Brendemuehl further opined that Plaintiff should only occasionally stoop and crouch. (Id.).

Dr. Bell testified regarding Plaintiff's mental impairments. Specifically, Dr. Bell testified that Plaintiff suffers from a mood/depressive disorder and a personality disorder. (R. 50). When discussing the limitations that Plaintiff faces due to these impairments, Dr. Bell initially stated that Plaintiff "is able to care for himself from the psychological point of view." (Id.). Dr. Bell then opined that Plaintiff: (1) is mildly restricted in his activities of daily living and in his ability to maintain concentration, persistence or pace; (2) is moderately restricted in his social functioning and (3) experiences no episodes of decompensation. (Id.). Based on his findings, Dr. Bell concluded that "there really is no basis for his meeting a listing from the psychiatric point of view." (Id.). However, Dr. Bell further concluded that, due to his temper, Plaintiff should have only limited contact with his co-workers and the public if he returns to work. (R. 50-51).

### 2. Plaintiff's Testimony

Plaintiff also presented testimony during the administrative hearing. Initially, Plaintiff detailed his work history. Specifically, Plaintiff testified that he has worked as a laborer for a manufacturing company and, more recently, driven a pickup truck for an oil company. (R. 59).

Plaintiff testified that he suffers from physical impairments, including GERD and left ankle problems. (R. 61). Regarding his GERD, Plaintiff stated that he experiences abdominal pain from time to time. (Id.). Regarding his ankle problems, Plaintiff stated that he experiences ankle swelling and pain. (R. 61-65). He explained that the longer he remains standing, the more his ankle swells and that, if it swells too much, he requires three days of bedrest before he can stand again. (R. 65). He further explained that he is

unable to place his full weight on his left ankle, which causes him to walk with a limp, and that he possesses a cane and crutches to use if needed. (R. 61-62).

Plaintiff estimated that he can be on his feet for a half-hour "but [that] seems . . . really hard." (R. 62). After standing, he stated that he must sit down and then walk again to ease the resulting pain. (R. 64) (stating that he experiences cycles where standing causes pain but later requires walking to ease the pain again). Plaintiff declared that he remains in a sitting position for the majority of each day. (Id.). Plaintiff further declared that, due to his ankle impairments, he experiences difficulty lifting objects because it places extra weight on his ankles and that he is unsure how much weight he is capable of lifting, although he knows that he is unable to lift forty-five pounds. (R. 62). He described his pain medication as a "little" effective but stated that he tries not to take it. (Id.). Finally, Plaintiff testified that he has a history of alcohol abuse but that he has not ingested any alcohol in seven or eight years. (R. 63).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Casey B. Vass, an impartial vocational expert, also testified during the administrative hearing. (R. 65-67). Initially, Mr. Vass testified regarding the characteristics of Plaintiff's past relevant work. (R. 65). Regarding Plaintiff's most recent job as a truck driver, Mr. Vass characterized the position as medium-exertional and semi-skilled. (Id.). Regarding Plaintiff's previous job as a laborer in a window factory, Mr. Vass characterized the position as medium-exertional and unskilled. (Id.).

After Mr. Vass described Plaintiff's past relevant work, the ALJ presented a hypothetical question for Mr. Vass's consideration. Specifically, the ALJ asked:

Consider an individual as in the present case but . . . assuming I should find that the person has a 12th grade education and work experience as mentioned, and looks like would have 47, 48-years of age at their onset. Assuming I should find that they suffer from a degenerative arthritis to the left ankle and pain and constant limitations in standing and walking. Suffer from major depressive disorder, recurrent, moderate, suffers from a personality disorder not otherwise specified. All of which would create some restrictions . . . on occasions. Dealing with the public there would be a moderate limitation, dealing with coworkers there's a moderate limitation. Be precluded from working around stairs and ramps, be precluded from kneeling and crawling. The rest of the postural levels would be occasionally. Could maybe stand, walk, be on his feet without interruption 30 to 40 minutes. He can maybe lift 20 pounds occasionally, 10 pounds frequently, he's precluded from working around ramps, ladders, scaffolds and around moving machinery and unprotected heights, as well as around vibration.

Now if those were his residuals would there be gainful employment for such an individual to perform on a sustained basis?

(R. 66). In response to the hypothetical, Mr. Vass testified that such an individual could work as a mailroom clerk, which is a light-exertional job, and as a small parts assembler, pallets inspector and surveillance system monitor, which are sedentary jobs.

(Id.). After the ALJ's hypothetical question, Mr. Vass declared that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. 67).

Plaintiff's counsel, Mr. Carpenter, also presented questions for Mr. Vass's consideration during the administrative hearing. (Id.). First, Mr. Carpenter asked:

Looking at the first hypothetical[,] . . . the limitation to being able to stand and walk or be on the feet for 30 to 40 minutes at a time specifically, if that 30 to 40 minutes on the feet had to be followed by a sit down break lasting up to half an hour, and that sort of thing would repeat itself over and over again, would that affect the mailroom clerk job you listed at the light level?

(Id.). Mr. Vass responded that the mailroom clerk position would be eliminated. (Id.).

Second, Mr. Carpenter asked how many absences caused by pain syndromes would be

tolerated "for the standard unskilled employer." (Id.). Mr. Vass responded that "a day and a half a month" would be tolerated but that two days a month would not be. (Id.).

### 2. Disability Reports

On or about March 14, 2013, Plaintiff submitted a Disability Report. (R. 200-06). In this report, Plaintiff indicated that he is unable to work due to the following conditions: (1) depression; (2) high blood pressure; (3) arthritis; (4) left ankle impairments; (5) high cholesterol; (6) acid reflux and (7) a thyroid impairment. (R. 201). Plaintiff further indicated that he stopped working on November 21, 2008, "[b]ecause of [his] condition(s)." (R. 202). Plaintiff stated that he has sought physical and mental health treatment for his conditions in the past. (R. 204). He listed Benicar, citalopram, Crestor, levothyroxine, meloxicam and Nexium as his prescribed medications. (Id.).

Plaintiff's attorney, Ms. Dils, submitted two Disability Report-Appeal forms on behalf of Plaintiff. (R. 222-25, 227-30). On or about June 20, 2013, Ms. Dils reported that Plaintiff "[n]eeds some assistance completing personal tasks" and that he is "[u]nable to walk or stand for any amount of time." (R. 224). She also updated Plaintiff's list of medications to Crestor, Benicar, aspirin, Synthroid and citalopram. (Id.). On or about July 23, 2013, Ms. Dils documented that Plaintiff had been experiencing "more ankle problems" and feeling more depressed since July 1, 2013. (R. 227). Ms. Dils further documented that, due to these changes in Plaintiff's condition, Plaintiff required more time to complete his personal tasks and could no longer participate in any social or recreational activities. (R. 229).

### E. Lifestyle Evidence

#### 1. Personal Pain Questionnaire, March 22, 2013

On March 22, 2013, Plaintiff, with the help of his sister, Patricia Cowan, submitted a Personal Pain Questionnaire. (R. 207-11). In this questionnaire, Plaintiff reports that he suffers from ankle pain, headaches and depression/overall body aches. (R. 207-09). Regarding his ankle pain, Plaintiff characterizes the pain as crushing and states that it lasts "continuously for [several] days." (R. 207). He states that the pain ranges from "bearable to totally unbearable." He explains that any type of movement or activity aggravates the pain and that "keeping [his] leg in a vertical position with no weight on it . . . help[s the pain] some." (Id.). He further explains that he takes Mobic for the pain but that it is never effective. (R. 208).

Regarding his headaches, Plaintiff characterizes the pain as throbbing. (Id.). He estimates that he experiences one headache a day "if [he] does not take [his] medication." (Id.). He states that, when he does experience a headache, the pain is so severe that he cannot concentrate or even get out of bed. (R. 209). He explains that he is prescribed Benicar for his headaches, which is "[s]ometimes" effective. (Id.).

Finally, regarding his depression/overall body aches, Plaintiff characterizes the pain as aching and continuous. (R. 209-10). He states that the pain is so severe that "[he is] bedridden." (R. 210). He explains that stress aggravates the pain and that, to relieve the pain, he takes Celexa and Synthroid, which are "[s]ometimes" effective. (Id.).

#### 2. Adult Function Report, March 23, 2013

On March 23, 2013, Plaintiff, again with the help of Ms. Cowan, submitted an Adult Function Report. (R. 212-19). In this report, Plaintiff states that he lives in a house

with his ninety-five-year-old mother, but that she "basically tends to her own needs." (R. 213). He further states that he is unable to work because:

> After having a bone removed from my ankle over ten years ago, I can no longer stand, twist, walk for any length of time without having sever[e] pain for several days. Also, I suffer from severe depression and hypothyroidism which keeps me from holding a full-time job.

(R. 212).

Plaintiff discloses that he is limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to ambulate independently, although he often requires crutches to do so.[7] (R. 218). He is able to perform his own personal care, although he experiences difficulty bathing and dressing when his ankle is hurting. (R. 213). He is able to prepare his own meals, which include sandwiches and frozen dinners but "mostly junk food." (R. 214). He is able to care for his pet dog, count change, follow written and spoken instructions and operate a motor vehicle, although he does not frequently leave his house. (R. 213, 215, 217). He is able to shop in stores for groceries, although his family does most of his shopping for him. (R. 215). He is able to wash his own laundry, so long as he sits down while doing so. (R. 214). Occasionally, he is able to perform light household chores. (Id.).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his pain and physical impairments. Plaintiff's pain/physical impairments affect his ability to: lift, squat, stand, walk, kneel and climb stairs. (R. 217). He explains that he is unable to "lift, stand[ ] or walk in any way that exerts pressure on [his] ankles." (Id.). He estimates that he is able to walk only "a few steps" before

---

[7] The crutches were not prescribed but instead "recommended [by a physician for] after [his] surgeries." (R. 218).

requiring "[a] few minutes of rest." (Id.). His physical impairments and pain also interfere with his ability to sleep. (R. 213).

Plaintiff further describes how his mental impairments cause limitations in his life. Plaintiff experiences difficulty with motivation due to his depression, which also effects how he socializes with others. (R. 213, 217). For example, he has "no tolerance" for others and has withdrawn from all social activities. (R. 217). He is also "unable to deal with" authority figures . . . [and] tr[ies] not to put [him]self in [a] position" where is required to do so. (R. 218). He easily loses interest in activities, causing him to be incapable of completing tasks or paying attention for extended period of time. (R. 217). He does not handle stress well. (R. 218).

Finally, Plaintiff details his routine activities. On a typical day, Plaintiff "spend[s] most of [his] time in bed." (R. 213). If he feels up to it, he tries to watch television or read. (Id.). He takes his daily medications, which consist of Lexapro, Mobic and ibuprofen.[8] (R. 219). He also prepares meals daily. (R. 214). Once a month, he shops for groceries. (R. 215).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in

---

[8] On a form entitled Claimant's Medications, dated June 6, 2014, Plaintiff reported that he is prescribed: (1) Benicar for his blood pressure; (2) citalopram for his depression; (3) levothyroxine for his thyroid impairments; (4) Nexium for acid reflux and (5) hydrocodone for pain. (R. 245). Plaintiff further reported that he takes one non-prescription medication, aspirin. (Id.).

the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the

Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since November 21, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis of the left ankle, gastroesophageal reflux disease (GERD), hypothyroidism, obesity, major depressive disorder, and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except suffers from arthritis of the left ankle with pain and limitations of standing walking [sic]. The claimant suffers from major depressive disorder and personality disorder with moderate limitations in his ability to work around the public and co-workers. He is precluded from working around stairs, ramps, kneeling, and crawling but could perform [the] rest of the postural movements occasionally. The claimant can stand, walk, or on his feet without interruptions for 30 minutes at a time. He is precluded from working around ramps, ladders, and scaffolds, moving machinery, unprotected heights, and vibration.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February 10, 1962[,] and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 21, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 30-39).

# VI.     DISCUSSION

## A.     Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ: (1) improperly assessed Plaintiff's credibility and (2) failed to adequately explain his RFC determination. (Pl.'s Br. in Supp. of his Mot. for Summ. J. ("Pl.'s Br.") at 6, ECF No. 11). Plaintiff requests that the Court "enter an order remanding the Commissioner's decision for a correction of the errors." (Id. at 15).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) properly assessed Plaintiff's credibility and (2) adequately explained his RFC determination. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 11, 13 ECF No. 15). Defendant further contends that both the credibility assessment and the RFC determination are supported by substantial evidence. (Id.). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640,

642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

## C. Analysis of the Administrative Law Judge's Decision

### 1. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ erred when he determined that Plaintiff is "not entirely credible" regarding the intensity, persistence and limiting effects of his symptoms. (Pl.'s Br. at 7). Defendant argues that the ALJ properly assessed Plaintiff's credibility and that the credibility determination is supported by substantial evidence. (Def.'s Br. at 11-13).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p[9] sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1. The individual's daily activities;

---

[9] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable at the date of the ALJ's decision.

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently

wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 33). Initially, the ALJ determined that Plaintiff had proved that he suffers from medical impairments that "could reasonably be expected to cause the alleged symptoms." (<u>Id.</u>). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (<u>Id.</u>).

### i.    Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one). At step three of the sequential evaluation process (R. 32), the ALJ noted that Plaintiff claims to spend most of his time in bed and that he tries to watch television and read. <u>See</u> <u>Pearson v. Colvin</u>, No. 2:14-CV-26, 2015 WL 3757122, at *34 (N.D. W. Va. June 16, 2015) (stating that, when reviewing an ALJ's decision, a court must read the "decision as a whole . . . [to evaluate whether the ALJ] consider[ed] the various complaints and limitations [the claimant] reported"). The ALJ further noted that Plaintiff lives with his mother and occasionally offers her assistance. (R. 32). Finally, the ALJ noted that Plaintiff prepares sandwiches and frozen dinners and performs light household chores. (<u>Id.</u>). After noting these activities, the ALJ concluded that Plaintiff suffers from only a mild restriction in his activities of daily living. (<u>Id.</u>).

Then, when discussing his credibility assessment at step four, the ALJ noted that Dr. Bell, whose opinion he accorded great weight, and Dr. Hursey also opined that

Plaintiff suffers from only a mild restriction in his activities of daily living. (R. 37).

Additionally, the ALJ noted that, on February 5, 2013, it was documented that Plaintiff

"was looking forward to warmer weather so he could do outdoor activities again," which

the ALJ noted "is totally inconsistent with his statement that he spends most of his time

in bed." (R. 34).

### ii. Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's

pain and other symptoms (factor two) and the factors that precipitate and aggravate

those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that

Plaintiff's primary complaints during the administrative hearing were of abdominal pain,

acid reflux symptoms and left ankle pain and swelling.[10] (R. 33). After noting these

symptoms, the ALJ recorded that he believed Plaintiff's "symptoms are not as severe as

alleged" due to, *inter alia*, Plaintiff's noncompliance issues and the treatment notes of

record.[11] (R. 33, 35).

Regarding factors that precipitate/aggravate Plaintiff's symptoms, the ALJ

documented that Plaintiff has reported that his left ankle symptoms are worse "in the

---

[10] Plaintiff argues that the ALJ "did not analyze [his] assertions of pain or the need to sit for 30 minutes after standing for 30 to 40 minutes." (Pl.'s Br. at 8). The undersigned disagrees for several reasons. First, the ALJ explicitly discussed Plaintiff's complaints of abdominal pain and left ankle pain and Plaintiff does not identify what other pain he experiences that the ALJ failed to discuss. (R. 33-34, 36). Second, the ALJ stated that Plaintiff "testified he could stand on his feet for 30 minutes but then has to sit down" and that "once [he] sits down after 30 minutes it makes it harder for him to get around," sufficiently addressing Plaintiff's standing limitation. (R. 33).

[11] Plaintiff argues that "the ALJ never actually explained the inconsistencies he found to exist between [Plaintiff's] testimony regarding his standing, walking, and sitting limitations and the evidence as a whole." (Pl.'s Br. at 9). The undersigned disagrees. The ALJ identified numerous inconsistencies when he summarized the evidence of record. (R. 33-37). For example, the ALJ noted that, despite Plaintiff's allegations of severe symptoms/limitations, Plaintiff could stand on one leg, has never been prescribed an assistive device such as a cane or walker, was noted not to exhibit any muscle atrophy or weakness and so on. (R. 34, 36).

morning or after prolonged sitting." (R. 34). The ALJ further documented that Plaintiff's left ankle symptoms are aggravated by "over use." (Id.).

### iii. Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for his symptoms (factor four). For example, the ALJ recorded that Plaintiff has been prescribed, *inter alia*, Mobic, Nexium, Synthroid, Lexapro and Celexa. (R. 34-36). The ALJ then noted that Plaintiff has documented compliance issues regarding his medication, suggesting that "his symptoms are not as severe as alleged." (R. 35). The ALJ further noted that "[t]reatment notes support[ ] the [conclusion that Plaintiff's] medications have been relatively effective in controlling his symptoms" when he is compliant. (R. 36). Finally, the ALJ noted that, while Plaintiff has alleged that his medications cause various side effects, "the medical records, such as office treatment notes, do not corroborate these allegations." (Id.).

### iv. Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of his symptoms (factor five) as well as measures Plaintiff uses to relieve his symptoms on his own (factor six). Regarding treatment other than medication that Plaintiff has received for his symptoms, the ALJ noted that Plaintiff underwent arthroscopic surgery on his left ankle but that "there is no evidence [that Plaintiff] received ongoing left ankle treatment" after the surgery.[12] (R. 33-34). The ALJ further

---

[12] Plaintiff argues that, when analyzing Plaintiff's left ankle impairments, the ALJ focused on evidence from 2010 instead of his more recent treatment records that corroborate his allegations of severe symptoms. (Pl.'s Br. at 9). However, the ALJ discussed all of the relevant treatment notes of record, including treatment notes from later years that reflect that Plaintiff sought treatment on various occasions for left ankle pain. (R. 34-36). Nevertheless, contrary to Plaintiff's contention that these records corroborate his allegations of severe symptoms, the ALJ

noted that Plaintiff was advised to participate in a "walking program." (R. 34). Finally, the ALJ noted that Plaintiff has not received any extensive treatment such as an endoscopy for his acid reflux symptoms. (See R. 35). As for measures Plaintiff uses to relieve his symptoms on his own, the ALJ noted that Plaintiff uses a non-prescribed cane at times, attempts to limit his physical activity and changes positions as needed. (See R. 33-34).

Plaintiff argues that "the fact that [Plaintiff] was 'advised to engage in a walking program' . . . is completely appropriate for an obese patient and is not inconsistent with [his] testimony that he could stand or walk for 30 minutes . . . but would need to sit for 30 minutes thereafter." (Id.). However, while Plaintiff is correct that the fact that he was advised to engage in a walking program does not completely discredit his allegations of severe symptoms by itself, it was not the only factor used by the ALJ to discredit Plaintiff. Because Plaintiff's recommended treatment is a valid factor for an ALJ to consider in a credibility assessment, the ALJ committed no error by discussing it.

### v.   Objective Findings

Another factor that the ALJ considered was the objective findings (factor seven) of record. While discussing the treatment notes comprising the record, the ALJ documented that the objective findings contained in the notes "do not support the extreme limitations alleged." (R. 33). For example, the ALJ noted that "the objective findings of [Plaintiff's] left [ankle] on a [2006] MRI did not indicate a diagnosis of arthritis or degenerative changes." (Id.). The ALJ further noted that the "objective findings reveal [that Plaintiff] is not as psychologically limited as alleged" because, *inter alia*, Ms. Spaulding documented that, while Plaintiff's judgment was moderately impaired, his attention and concentrate were only mildly impaired and his memory, persistence and

---

noted that Plaintiff's symptoms were controlled by medication during these years. (R. 36).

social functioning were normal. (R. 36).

Plaintiff argues that the ALJ failed to consider an objective finding that supports his allegations of severe symptoms. (Pl.'s Br. at 10). Specifically, Plaintiff argues that the ALJ failed to consider Dr. Dauphin's November 27, 2002, treatment note, in which Dr. Dauphin opined that Plaintiff suffers from "probable" avascular necrosis, "[although] it does not show on [the recent] MRI." (Id.). The undersigned finds this argument unpersuasive and notes that the record does not reflect that Plaintiff was ever definitely diagnosed with avascular necrosis. Moreover, an ALJ is "not obligated to comment on every piece of evidence presented" in his written opinion. Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015).

### vi. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

### 2. Whether the ALJ Adequately Explained his RFC Determination

Plaintiff argues that the ALJ "failed to provide a clear explanation for the RFC limitations he found or rejected." (Pl.'s Br. at 11). Defendant argues that substantial evidence supports the ALJ's RFC determination. (Def.'s Br. at 13).

The "ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact." Farnsworth v. Astrue, 604 F. Supp. 2d 828, 857 (N.D. W. Va.

2009); see also 20 C.F.R. § 416.946 (2011). When performing an RFC assessment, an ALJ "must first identify the [claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the claimant's physical abilities, mental abilities and "other work-related abilities." Williams v. Comm'r of Soc. Sec., No. 3:14-CV-24, 2015 WL 2354563, at *4 (N.D. W. Va. May 15, 2015). After the ALJ completes this "function-by-function analysis[,] . . . he [may] express the RFC in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. The RFC "assessment must [then] include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id.

In the present case, the undersigned finds that the ALJ sufficiently discussed his reasoning for the RFC determination. Initially, the ALJ identified Plaintiff's symptoms and limitations (R. 33) before analyzing Plaintiff's work-related abilities on a function-by-function basis. Specifically, the ALJ determined that Plaintiff retains the ability to perform light, unskilled[13] work but that Plaintiff is: (1) limited in his ability to stand and walk; (2) moderately limited in his ability to work around the public and co-workers; (3) unable to climb stairs/ramps, kneel and crawl but able to perform all other postural movements occasionally; (4) limiting to standing, walking or being on his feet without interruptions for thirty minutes at a time and (5) unable to work around ramps, ladders, scaffolds, moving machinery, unprotected heights and vibrations. (R. 32-33). After completing this function-by-function basis, the ALJ included a narrative discussion of the

---

[13] Although not stated outright, the ALJ's decision makes clear that the ALJ limited Plaintiff to unskilled work with certain limitations. See Pearson, No. 22015 WL 3757122, at *34 (stating that, when reviewing an ALJ's decision, a court must read the "decision as a whole"). The undersigned discusses Plaintiff's mental RFC in more detail below.

evidence over the course of five pages. When discussing the evidence, the ALJ was sufficiently specific to make clear how he determined the RFC and the evidence on which he relied.[14] In other words, the undersigned is able to discern from the ALJ's discussion of the evidence how the ALJ arrived at his conclusions regarding Plaintiff's limitations and abilities and is not left guessing at the ALJ's reasoning.

Plaintiff points to the ALJ's statement that Plaintiff "can stand, walk, or [be] on his feet without interruptions for 30 minutes at a time," arguing that the ALJ failed to determine how long he would need to sit before standing again or how many hours he could be on his feet in a workday. (Pl.'s Br. at 12-13). The undersigned finds that this argument lacks merit. The ALJ determined that Plaintiff is capable of performing light work, which "requires a good deal of walking or standing." SSR 83-10, 1983 WL 31251, at *5 (January 1, 1983). While Plaintiff argues that the ALJ did not make clear that he is capable of a good deal of walking or standing when he is only able to be on his feet for thirty minutes at a time, the undersigned disagrees. At step five of his opinion, the ALJ noted:

> The claimant's representative asked the vocational expert if the mailroom clerk job would remain if the [hypothetical] individual repeatedly required a sit down break lasting 30 minutes after being on their feet for 30 to 40 minutes. The vocational expert stated the mailroom clerk job would be eliminated. However, the evidence does not support such limitation.

(R. 39); see also Pearson, No. 22015 WL 3757122, at *34 (stating that, when reviewing an ALJ's decision, a court must read the "decision as a whole"). Because an ALJ's decision must be read as a whole, the ALJ made clear in his decision that, while Plaintiff can only be on his feet for thirty minutes at a time, Plaintiff does not require such

---

[14] For example, the ALJ clearly stated that he accorded Dr. Dauphin's opinion no weight, Drs. Bell and Brendemuehl's opinions great weight, Drs. Goldsmith and Franyutti's opinions little weight and so on, explaining why each opinion deserved the specified amount of weight.

extensive breaks as to prevent him from standing or walking for a good deal of the workday. Therefore, the ALJ provided sufficient reasoning of his RFC determination for a reviewing court to conduct a meaningful review of his decision and Plaintiff's argument fails.

Plaintiff also points to the ALJ's statement that Plaintiff possesses "moderate limitations in his ability to work around the public and co-workers,"[15] arguing that the ALJ did not phrase this statement properly for an RFC determination, which is supposed to specify what a claimant can do in a work setting despite his or her limitations. (Pl.'s Br. at 14). The undersigned finds that this argument has little merit. The ALJ thoroughly discussed Plaintiff's mental symptoms and limitations in his decision (see R. 35-36) and made clear that he determined that Plaintiff is capable of performing all of the mental functions required of unskilled work, with the exception that he may only work around the public and co-workers in a limited capacity. (See R. 32-39) (declaring that Plaintiff "is not as psychologically limited as alleged," that his mental symptoms are "fairly well controlled with medication" and that he is capable of working in "the unskilled light occupational base"). Therefore, any error on the part of the ALJ in not properly phrasing Plaintiff's mental RFC is harmless in nature. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir.1994) (holding that remand is unnecessary, despite an ALJ's error, when the ALJ would have reached the same result notwithstanding his error). Accordingly, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

_____

[15] To the extent that Plaintiff is arguing that the ALJ did not discuss his reasoning for finding that Plaintiff possesses moderate limitations in his ability to work around others, the undersigned notes that the ALJ explicitly stated that Dr. Bell testified that "there is mention [in the record] that [Plaintiff] has problems with his temper and therefore . . . should have limited contact with the public and co-workers," an opinion to which he accorded "great weight." (R. 37).

# VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's applications for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 21st day of November, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE